UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL RAPOLLA,<br><br>Plaintiff,<br><br>v.<br><br>WASTE MANAGEMENT EMPLOYEE BENEFITS PLAN, et al.,<br><br>Defendants. | Case No. 13-cv-02860-JST<br><br>**ORDER RE: CROSS-MOTIONS FOR JUDGMENT UNDER RULE 52**<br><br>Re: ECF No. 25, 30 |

In this ERISA action, the parties have filed cross-motions for judgment under Federal Rule of Civil Procedure 52. The Court held a hearing on the motions on May 8, 2014. For the reasons set forth below, Rapolla's cross-motion is GRANTED, and Defendants' cross-motion is DENIED.

## I.     BACKGROUND

### A.     The Parties and Claims

Plaintiff Michael Rapolla brings this action against Defendants Waste Management Health and Welfare Benefits Plan ("the Plan") and Life Insurance Company of North America ("LINA"), which is a fiduciary to and insurer of the Plan.[1] Rapolla seeks to recover long-term disability benefits under the Plan, which was sponsored by his former employer, Waste Management, Inc. ("WM"). WM specializes in waste collection, disposal, and recycling.

Rapolla asserts the following two claims in the complaint: (1) a claim for the improper denial of benefits under ERISA; and (2) a claim for prejudgment interest under California Insurance Code section 10111.2.

---

[1] Rapolla erroneously sued the Plan as "Waste Management Employee Benefits Plan." Compl. ¶ 2. All parties agree that the Plan is subject to ERISA.

### B. Findings of Fact

#### 1. Terms of the Plan and the Policy

The Plan provided Rapolla with long-term disability benefits. WM funded these long-term disability benefits through a LINA insurance policy. LINA underwrote WM's long-term disability coverage under Group LTD policy number FLK-0980024 ("the Policy"). [DR 1356]. The Policy was incorporated by reference into the terms of the Plan when the Plan became funded through the Policy. See DR 2116, Plan § 5.1 (providing that "[t]he Benefit Programs may be funded through . . . Insurance Company contracts . . . to the extent that a trust agreement or Insurance Company contract funds part or all of the benefits provided by a particular Benefit Program, such agreement or contract shall be deemed part of the Plan and incorporated herein by this reference.").

Under the Plan, a participant is considered disabled if he cannot perform his own occupation during the first 24 months of his disability. After this 24-month period, the Plan defines a participant as disabled only if he is (1) unable to perform all the material duties of any occupation for which he is, or may reasonably become, qualified based on education, training, or experience; and (2) is unable to earn 60% or more of his Covered Earnings. [DR 1357]

If a claimant is found disabled, the Plan covers 60% of Covered Earnings to the Social Security Normal Retirement Age of the claimant, which in this case would have been 66 years and 8 months. [DR 1357-59].

The Plan grants discretionary authority to the Plan Administrator "to construe and interpret the terms of the Plan, and to resolve all ambiguities, inconsistencies or omissions therein; [and] to decide all questions of eligibility and determine the amount, manner, and time of payment of any benefits hereunder." [Plan § 11.1(a), (b).] [DR 2144].

The Plan also grants the Plan Administrator the ability to delegate this authority. Specifically, the Plan provides that the Administrator has the power "to delegate authority with regard to its responsibilities hereunder to any . . . insurance carrier" and "to appoint or name a Claims Administrator to handle administration of claims." [2010 Plan §§ 11.1(j-l), 11.2] [DR 2144-45] ("The Administrator shall have the power to delegate specific duties, discretionary and other authorities . . ."); see also [2003 Plan §§ 9.1(j), (l); 9.3, 9.5.] [DR 2223-33]. The Plan

2

Administrator here delegated his authority to LINA with respect to claims for long-term disability benefits under the Plan. [DR 2076-77] (providing that "[b]enefits will be paid only if the . . . insurance company . . . decides in its discretion that the applicant is entitled to them").

The Plan provides that it "shall be construed in accordance with the laws of the State of Texas (determined without regard to any conflicts of law provisions), to the extent not preempted by federal law." [DR 2167]. Like the Plan, the Policy provides that it was "issued in Texas and shall be governed by its laws." [DR 1377].

### 2. Rapolla's Disability Claims Under The Plan

Rapolla, who is now 55-years-old, became disabled on April 7, 2010. [DR 1259]. At the time, he was employed by WM as a route manager, which required the lifting of heavy garbage cans, as well as office or clerical work.[2] [DR 1308]. This position had a DOT classification of "Garbage Collector Driver," which is a "medium" occupation. [DR 1304]. Medium work involves lifting no more than 50 pounds at a time, with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. § 404.1567(c).

Rapolla had a history of on-the-job injuries and orthopedic problems, including prior shoulder surgeries, diagnosed degenerative disc disease of the lumbar region [DR 1228], and prior herniated discs at multiple levels of his spine [DR 681]. Nevertheless, Rapolla had continued working despite these acute conditions. He is deaf in one ear and blind in one eye. [DR 718].

Rapolla filed a claim for long-term disability benefits with LINA, which found him disabled effective April 8, 2010, on July 22, 2010, and paid him full disability benefits totaling $3,408 per month for 24 months thereafter. [DR 282]. At the time he became disabled, Rapolla's salary was $5,680.11 per month. [DR 0006].

Once this 24-month period ended, LINA assessed Rapolla's functionality to determine whether he was unable to perform "any occupation" as required by the plan for continued disability payments. At LINA's request, Rapolla underwent a Functional Capacity Evaluation

---

[2] The job description for Route Manager states that 50 % of the job consists of indoor activities or office work, including dispatching, monitoring demand, using the computer, and conducting performance reviews. [DR 1308-09].

("FCE") on June 12, 2012.  The FCE was conducted by Michael Schaal. [DR 945]  Schaal found that Rapolla was capable of sitting for up to two-thirds of the day; occasional walking, standing, and reaching; lifting of up to 10 pounds; and carrying of up to 20 pounds. [DR 943]  Schaal observed some self-limiting behavior, however.  [DR 945].

Based in part upon the abilities and limitations stated in the FCE and upon the transferable skills from Rapolla's work experience, a vocational rehabilitation counselor at LINA conducted a transferable skills analysis ("TSA").  [DR 941].  The purpose of a TSA is to identify the core skill sets of the participant based upon his education, training, and experience, and then to determine which of these skills are transferable to other occupations that he is physically able to perform. Vocational Rehabilitation Counselor Lisa Rosetti identified five appropriate potential occupations, all at the "sedentary" work level, consistent with the limitations set forth in the FCE:  Expediter, Personnel Scheduler, Protective-Signal Operator, Repair-Order Clerk, and Scheduler Maintenance.

LINA also hired an investigator to follow Rapolla from December 27-29, 2011, and from June 1-3, 2012.  [DR 1011, 923].  The investigator obtained video footage of Rapolla on both occasions.  In the earlier video, Rapolla was seen visiting someone, standing for some time, and running errands that included getting his car repaired.  [DR 1011, 1017, and video].  In the later video, Rapolla was seen walking around a lake and then running errands.  [DR 930 and video].

On June 28, 2012, LINA wrote Rapolla a letter advising him that he did not satisfy the "any occupation" definition of disability.  The letter described the difference between the two standards and the bases for its decision, including the FCE and the TSA.  [DR 920].  LINA sent Rapolla a check for benefits he would be owed through the end of the "own occupation" period, which was on October 4, 2012.  [DR 921].

### 3. Rapolla's Appeal under the Plan

On July 7, 2012, Rapolla's counsel, Laurence F. Padway, told LINA that he would represent Rapolla on appeal.  [DR 841].  In support of the appeal, Padway submitted a favorable Social Security disability benefits award on March 11, 2013, that was issued on October 18, 2012; the SSA file; an interview of Rapolla conducted by Padway; and a letter enclosing an audio file of the SSA hearing.  [DR 811, 812, 813, video].  The Social Security decision stated that Rapolla was

disabled from his combined impairments starting from August 10, 2009, and it also pronounced his subsequent return to work until April 8, 2010, to be an unsuccessful work attempt. [DR 813, 818]

The records that LINA reviewed on appeal included two medical reports by Rapolla's own treating physicians, who came to different conclusions.

Dr. Chen, the primary physician treating plaintiff for his back issues, completed a form concerning Rapolla's level of impairment on August 8, 2012. [DR 739]. Dr. Chen noted that Rapolla "has been capable of performing sustained sedentary work on a regular and continuing basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule." Id. He clarified this statement by indicating that Rapolla "can sit, stand or walk 15-30 minutes at one time but should be able to work 8-hour day if he can alternate as needed. Can lift or carry 6-10 lbs for an hour a day." Dr. Chen also stated that Rapolla's "status has been worse since 10/11/11, and he would not be able to sit constantly for 6 hours/day, but he would be able to sit intermittently throughout the day out of an 8 hour work day. Additional concerns can be addressed by an objective FCE." [DR 745].

On the other hand, Dr. Henstorf, the treating orthopedic surgeon who saw Rapolla more frequently than Dr. Chen, observed on August 9, 2012, that Rapolla had a more limited range of motion in his back, increased weakness, and was unable to stand erect. He further stated that it was his "opinion that the patient remains continuously totally disabled and essentially unemployable." [DR 793-794]. On July 21, 2011, Dr. Henstorf noted that Rapolla was "approaching a point in time when his symptoms are not longer tolerable or manageable." [DR 660]. Dr. Henstorf found Rapolla "totally disabled" for the past year (i.e., from mid-2010 until his visit in July, 2011), and considered it "unlikely" that he would ever be able to return to work in any capacity. Id. On August 9, 2011, Dr. Henstorf again examined Rapolla. Dr. Henstorf reported that Rapolla had difficulty standing for more than ten minutes, sitting in one position for more than ten minutes, and that he needed to "constantly shift and adjust his position in order to remain even marginally comfortable." [DR 793.] He further noted that Rapolla "is unable to stoop, bend, lift or carry; and he is essentially totally disabled as a result of his condition." Id.

5

In light of the conflicting medical assessments of Rapolla's functionality by his own treating physicians, LINA sought peer reviews by two specialists. In their May 20, 2013, reports, both specialists concluded that Rapolla could do sedentary work. [DR 335, 1401].

First, Dr. Pemmaraju recognized Rapolla's long history of "chronic pain and objective physical dysfunction with multiple previous surgeries." [DR 345]. Dr. Pemmaraju agreed with Dr. Chen's conclusion, however, that Rapolla was able to perform the physical requirements of a sedentary occupation, and he characterized Dr. Henstorf's conclusion that Rapolla was "essentially unemployable" as "not supported." [DR 345].

Second, Dr. Whelan also disagreed with Dr. Henstorf's opinion, concluding that the FCE conducted by Michael Schaal on June 12, 2012, was entitled to greater weight than Dr. Henstorf's opinion because it better reflected Rapolla's true functional limitations. Dr. Whelan also agreed with Dr. Chen's assessment that Rapolla had the physical capacity to perform sedentary work. [DR 1413-1414].

On June 7, 2013, Senior Appeal Specialist Anna Bedikian upheld the initial claim determination. [DR 331]. The letter discussed and relied upon the medical records, Dr. Chen's finding that Rapolla could perform sedentary work, and the TSA's identification of five occupations that Rapolla could perform. She acknowledged the Social Security disability award but pointed out that the Social Security Administration used different criteria in making its determination. She invited Rapolla to file a voluntary second appeal but he chose instead to file a complaint in district court on June 20, 2013.

### C. Objections

Defendants filed objections to portions of the evidence submitted by Rapolla in support of his cross-motion for judgment. ECF No. 35. Because these objections were filed separately from Defendants' opposition to Rapolla's cross-motion and thus violate Civil Local Rule 7-3(a), the Court will not consider them for any purpose.[3] See Civil L.R. 7-3(a) ("Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum.").

---

[3] In any event, the Court did not rely on any of the materials that are subject to Defendants' objections in resolving the instant cross-motions.

6

## II. LEGAL STANDARD

When presented with motions for judgment under Federal Rule of Civil Procedure 52, "the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." Caplan v. CNA Fin. Corp., 544 F. Supp. 2d 984, 990 (N.D. Cal. 2008) (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999)).

The standard of review for a denial of ERISA benefits depends upon the terms of the benefit plan. A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If "the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," an abuse of discretion standard applies. Id. at 102.

## III. DISCUSSION

### A. The Applicable Standard of Review is De Novo

As a threshold matter, the Court must determine what standard of review applies to the denial of benefits at issue.

Defendants argue that abuse of discretion is the appropriate standard of review because the Plan gives discretion to LINA "to construe and interpret the terms of the Plan, and to resolve all ambiguities, inconsistencies or omissions therein; [and] to decide all questions of eligibility and determine the amount, manner, and time of payment of any benefits hereunder." Plan § 11.1(a), (b) [DR 2144].[4]  Defendants also contend that California's prohibitions on grants of discretion in connection with insurance policies are irrelevant to the resolution of the instant motions because they apply only to the Policy and not the Plan.  Finally, Defendants argue that these prohibitions

---

[4] Furthermore, the Plan also grants the Plan Administrator the ability to delegate this authority "with regard to its responsibilities hereunder to any . . . insurance carrier" and "to appoint or name a Claims Administrator to handle administration of claims." 2010 Plan §§ 11.1(j-l), 11.2 [2144-45] ("The Administrator shall have the power to delegate specific duties, discretionary and other authorities .").

also are inapplicable because the Policy and the Plan are governed by Texas law.

Rapolla contends that the denial must be renewed de novo, because the Policy's grant of discretionary authority is void under California law. Rapolla also argues that, even if the grant of discretionary authority is valid, it cannot serve to change the standard of review to abuse of discretion because the grant is contained only in the Plan and not in the Policy, and the Plan is not a part of the Policy under the Policy's incorporation clause.

The Court concludes that, to the extent that LINA was intended to fund the benefits at issue through the Policy, the Policy and the Plan are a part of a single integrated contract, because the Policy became a part of the Plan when the former became effective.[5] Thus, because the grants of discretionary authority contained in the Plan also are a part of the Policy, such grants are void in light of California Insurance Code section 10110.6, which provides, in relevant part:[6]

> (a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.
>
> (b) For purposes of this section, "renewed" means continued in force on or after the policy's anniversary date.
>
> (c) For purposes of this section, the term "discretionary authority" means a policy provision that has the effect of conferring discretion on an insurer or other claim administrator to determine entitlement to benefits or interpret policy language that,

---

[5] The Policy was incorporated by reference into the terms of the Plan when the Plan became funded through the Policy. See DR 2116, Plan § 5.1 (providing that "[t]he Benefit Programs may be funded through . . . Insurance Company contracts . . . to the extent that a trust agreement or Insurance Company contract funds part or all of the benefits provided by a particular Benefit Program, such agreement or contract shall be deemed part of the Plan and incorporated herein by this reference.").

[6] The grant of discretion to LINA was possible only by virtue of LINA's status as the Plan's insurance carrier. The Plan provides that the Administrator has the power "to delegate authority with regard to its responsibilities hereunder to any . . . *insurance carrier*" and "to appoint or name a Claims Administrator to handle administration of claims." 2010 Plan §§ 11.1(j-l), 11.2 [DR 2144-45] ("The Administrator shall have the power to delegate specific duties, discretionary and other authorities . . ."); see also 2003 Plan §§ 9.1(j), (l); 9.3, 9.5. [DR 2223-33].

> in turn, could lead to a deferential standard of review by any reviewing court.
> . . .
>
> (g) This section is self-executing. If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

This section, by its own terms, applies to any policy or agreement that provides "disability insurance coverage" to "any California resident" regardless of where it was offered, issued, delivered, or renewed. Here, no party disputes that Rapolla is a resident of California. See Compl. ¶ 2 (alleging that Rapolla is a resident of this judicial district). As such, this section applies to the Policy and Plan at issue (which together are one contract) regardless of their Texas choice-of-law provisions, so long as such instruments were offered, issued, delivered, or renewed after the effective date of the statute, which is January 1, 2012, but before Rapolla's claim accrued See Gonda v. The Permanente Med. Grp., Inc., ---F.3d---, Case No. 11-cv-1363 SC, 2014 WL 186354, at *2 (N.D. Cal. Jan. 16, 2014).

No party disputes that Rapolla's claim accrued on June 28, 2012, which is the date on which his claim for permanent disability benefits was denied. See Grosz–Salomon v. Paul Revere Life Insurance, 237 F.3d 1154 (9th Cir. 2001) (holding that an ERISA cause of action based on a denial of ERISA benefits accrues at the time benefits are denied).

Thus, the only issue is whether the policy was offered, issued, delivered, or renewed on or after January 1, 2012, but before June 28, 2012. For the purposes of section 10110.6, a policy automatically renews every year on the policy's anniversary date. See Cal. Ins. Code § 10110.6(b) (providing that "renewed" means "continued in force on or after the policy's anniversary date"). Here, the Policy became effective on January 1, 2005, and it was most recently amended[7] in 2009.[8] [DR 1377]. This means that the Policy's renewal date falls within the relevant time period, as the policy continued in force after it was amended in 2009 and through January 1, 2012. See Polnicky v. Liberty Life Assurance Co. of Boston, ---F.3d---, Case No. 13-1478 SI, 2013 WL

---

[7] The document at DR 1377 does not show the amendment date, but that is the record citation given in Defendant's brief, ECF No. 25 at 14, and the court accepts it.

[8] The Plan, on the other hand, was most recently amended in 2010. [DR 2094].

6071997, at *3 (N.D. Cal. Nov. 18, 2013) (applying de novo standard of review to ERISA claim for denial of benefits because "[t]he Policy was continued in force after its January 1, 2012 anniversary date, [so] any provision in the Policy attempting to confer discretionary authority to Liberty Life was rendered void and unenforceable"). As such, any grants of discretion that can be deemed to be a part of the Policy are void and unenforceable, and thus, the denial of benefits at issue must be reviewed de novo. See id; Gonda 2014 WL 186354 at *3.

Defendants contend that section 10110.6 does not apply because that section applies only to insurance policies or agreements, and not to ERISA plans, and here, the delegation provision is included only in the Plan and not in the Policy. As discussed above, the Policy and the Plan are a single composite agreement, and for that reason, section 10110.6 applies to the delegation provisions at issue. Concluding otherwise would render section 10110.6 "practically meaningless," as "ERISA plans could grant discretionary authority to determine eligibility under an insurance policy, so long as the grants were set forth somewhere other than in the insurance policy." Gonda, 2014 WL 186354 at *3.

Defendants also contend that section 10110.6 does not apply because the section is preempted by ERISA. Defendants note that, under 29 U.S.C. § 1144(a), ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." They also recognize that § 1144(b) saves from preemption "any law of any State which regulates insurance, banking, or securities." Defendants contend that section 10110.6 does not fall within this savings clause because, if it did, the states would be able to regulate ERISA plans via the savings clause, which is prohibited by ERISA.

The Court is not persuaded by this argument. To fall under the savings clause, a state law (1) "must be specifically directed toward entities engaged in insurance," and (2) "must substantially affect the risk pooling arrangement between the insurer and the insured." Morrison, 584 F.3d 837, 842 (9th Cir. 2009) (internal quotations omitted). The Ninth Circuit has already held that state laws regulating discretionary clauses in insurance policies fall within the scope of the savings clause. Id. And, as some judges in this district have noted, there is "no reason why the result should differ when a state law is directed toward a discretionary clause contained in an

agreement or another document relating to the administration of an insurance policy," including a benefits plan. See Gonda, 2014 WL 186354 at *4. This is particularly true where, as here, the Policy and the Plan operate as one unified contract.

### B.     Rapolla Has Shown that He Is Disabled under the Plan

Having determined that the applicable standard of review is de novo, the Court now turns to the question of whether Rapolla has shown that he is entitled to disability benefits under the Plan. "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Const. Mgmt., Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010) (holding that, in an ERISA action for the denial of disability benefits, the burden of proof is on the claimant when the standard of review is de novo).

Here, Rapolla can recover the benefits denied to him under the Plan only if he shows that he was (1) unable to perform all the material duties of any occupation for which he may reasonably become qualified based on his education, training, or experience; and (2) was unable to earn 60% or more of his Covered Earnings, or at least $3,576.77 per month, in a new occupation. [DR 1357-58, 971].

The totality of the evidence in the record supports a finding that Rapolla is disabled within the meaning of the Plan.

After evaluating Rapolla's medical records, expert testimony, and Rapolla's own testimony, an ALJ determined on October 18, 2012, that Rapolla is unable to engage in "any substantial gainful activity" in light of his severe medical impairments, including a "left shoulder rotator cuff impingement; osteoarthritis; AC joint injury; degenerative joint disease of the lumbar spine; (herniated nucleus pulposes L4-5); left knee, medial meniscal tear, arthrosis; status post knee arthroscopy (with partial medial and lateral menisectomies, debridement/chondroplasty) . . . and right shoulder pain." [DR 818]. Though the criteria for finding disability in Social Security cases differs from the criteria applicable here, the difference works in Rapolla's favor, because the Social Security's standard for disability is more stringent than the applicable standard for

11

disability under the Plan, as the former does not take into account Rapolla's past earnings or location. Defendants do not dispute this. As such, the Court accords significant weight to the ALJ's finding that Rapolla is incapable of working.

The Court also places significant weight on the opinion of Dr. Henstorf, the treating physician who appears to have examined Rapolla most frequently. He concluded on August 9, 2012, that Rapolla "remains continuously totally disabled and essentially unemployable" based on the limited range of motion in his back, increased weakness, and his inability to stand erect. [DR 793-794]. Though Dr. Henstorf never "performed a formal functional capacity assessment" on Rapolla, his determinations as to Rapolla's physical condition are nevertheless entitled to significant weight in light of his unmatched familiarity with Rapolla and his ailments. [DR 794]

The Court's finding of disability is not significantly undermined by the evidence in the record that is less favorable to Rapolla, because such evidence acknowledges the severity of his conditions and recognizes the plausibility of his stated incapacity to work.

For example, Dr. Chen concluded that Rapolla could perform sedentary work on a regular and continuing basis. DR 739. But this conclusion was subject to many qualifications, which severely undermine the notion that Rapolla is employable. For example, Dr. Chen indicated that Rapolla could sit "at one time [up to] probably 15-30 minutes." He also indicated that Rapolla's pain would cause "mild" impairment of attention and concentration, "mild" impairment of the ability to perform within a schedule, "mild" impairment of the ability to complete a normal work day without interruption from medically based symptoms, and "mild" impairment of the ability to perform at a consistent pace. Finally, and perhaps most importantly, Dr. Chen recognized that "[p]atients with a specific diagnosis and exam findings can have dramatically different levels of function." [DR 163].

Likewise, Rapolla's Functional Capacity Evaluation concluded that he could sit between 2.5 and 5.5 hours per day. This conclusion, however, appears to be based in part on observed "self-limiting behaviors" during the test. Importantly, the evaluator acknowledged that such behaviors could be attributed to a number of factors, including pain, fear of reinjury, anxiety, or depression, not just malingering. DR 800. Absent more credible evidence of malingering, the

12

Court finds that the conclusions reached in this evaluation are inconclusive as to Rapolla's abilities.

Relatedly, the Court declines to accord much weight to the Transferrable Skills Assessment that LINA performed on Rapolla, because this assessment is based in part on the inconclusive Functional Capacity Evaluation discussed above, and because it does not appear to take into account the cognitive limitations or difficulties that Rapolla may suffer in an office environment as a result of his chronic physical pain, his partial blindness, and partial deafness.

The Court assigns little weight to the opinions of Dr. Whelan and Dr. Pemmaraju, who concluded that Rapolla can perform some sedentary work, because their reports lack a satisfactory degree of credibility. First, neither doctor personally examined Rapolla; instead, their conclusions were based purely on their review of Rapolla's medical records.  Second, it appears that at least one of these doctors failed to independently evaluate Rapolla's medical records, because the portions of both reports that summarize the records are substantially identical. See DR 1401, 335.

Finally, the Court acknowledges the results of Defendants' surveillance of Rapolla but finds that this evidence also is inconclusive as to Rapolla's capacity to work.  [DR 10 1026, 1046, 1011, 927].  That Rapolla is able to leave the house for a few hours per day does not mean that he is capable of sitting at a desk and performing an office job.

Accordingly, the Court concludes that Rapolla is entitled to benefits under the Plan from October 6, 2012, until entry of judgment.

### C. Prejudgment Interest

"A district court may award prejudgment interest on an award of ERISA benefits at its discretion.  Generally, the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." Blankenship v. Liberty Life Assur. Co. of Boston, 486 F.3d 620, 627-28 (9th Cir. 2007) (internal citations and quotation marks omitted).

Here, the Court finds that prejudgment interest under § 1961 would adequately compensate Rapolla for the losses he incurred in connection with the denial of benefits at issue.  Rapolla's

request for prejudgment interest under California Insurance Code section 10111.2 is therefore DENIED.

## IV. CONCLUSION

Rapolla's cross-motion for judgment is GRANTED, and Defendants' cross-motion for judgment is DENIED. Within fourteen days of the date this order is filed, the parties shall file a stipulated judgment indicating the amount of benefits and prejudgment interest that are due to Rapolla based on the findings and conclusions in this order.

**IT IS SO ORDERED.**

Dated: June 25, 2014



JON S. TIGAR
United States District Judge